715 F.2d 713
 31 Cont.Cas.Fed. (CCH) P 71,390
 B.K. INSTRUMENT, INC., Plaintiff-Appellant,
v.
UNITED STATES of America, Caspar Weinberger, Secretary of
Defense, L.F. Skibbie, Commanding General, U.S.
Army CECOM, American Kal Enterprises,
Inc., Defendants-Appellees.
 No. 1546, Docket 83-6124.
 United States Court of Appeals,
Second Circuit.
 Argued June 16, 1983.
Decided Aug. 4, 1983.
 
 Gregory E. Ronan, New York City (Max E. Greenberg, Cantor & Reiss, Lester E. Rivelis and Robert J. Miletsky, New York City, on the brief), for plaintiff-appellant.
 Patrick B. Northup, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendants-appellees.
 Before FRIENDLY, OAKES and CARDAMONE, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This expedited appeal from an order of Chief Judge Weinstein in the District Court for the Eastern District of New York, which comes to us on a meagre record, raises important questions concerning litigation between a disappointed bidder for a Government contract and the United States.
 
 
 2
 The Facts and the Proceedings in the District Court
 
 
 3
 The facts, to the extent they are revealed by the complaint and plaintiff's motion for a temporary injunction, are as follows: On November 15, 1982, the Commander, U.S. Army Communications--Electronics Command (CECOM), Tactical Radio Branch, headquartered at Fort Monmouth, N.J., issued Solicitation No. DAAB07-83-B-B026, which sought the submission of bids for a quantity of TK-100/G electronic tool kits. The Solicitation provided that bids would be received until December 20, 1982, and opened on that date.
 
 
 4
 Plaintiff B.K. Instrument, Inc. (BK) submitted a bid of $479,776. One of the representations in the many page Solicitation was filled out as follows:
 
 
 5
 K. 1. SMALL BUSINESS (See par. 14 on SF 33-A.)
 
 
 6
 He (X) is, ( ) is not, a small business concern. If offeror is a small business concern and is not the manufacturer of the supplies offered, he also represents that all supplies to be furnished hereunder ( ) will, (X) will not, be manufactured or produced by a small business concern in the United States, its possessions, or Puerto Rico.
 
 
 7
 Paragraph 14 of Standard Form (SF) 33-A (Rev. 11-81) reads as follows:
 
 
 8
 SMALL BUSINESS CONCERN. A small business concern for the purpose of Government procurement is a concern, including its affiliates, which is independently owned and operated, is not dominant in the field of operation in which it is submitting offers on Government contracts, and can further qualify under the criteria concerning number of employees, average annual receipts, or other criteria, as prescribed by the Small Business Administration. (See Code of Federal Regulations, Title 13, Part 121, as amended, which contains detailed industry definitions and related procedures).
 
 
 9
 The cover sheet to the Solicitation notified bidders that this procurement contract contained a provision for a 100% set-aside for small businesses. Section L. 67, Solicitation at p. L-6, incorporated by reference the definition of this set-aside as contained in Defense Acquisition Regulation (DAR) 7-2003.2, 32 C.F.R. § 7:469 (1982). This regulation explained that a manufacturer or regular dealer [small business concern] submitting offers in his own name must agree to furnish in the performance of the contract end items manufactured or produced by small business concerns.
 
 
 10
 Authority for restricting invitations for solicitations to small businesses is provided by the Small Business Act, 15 U.S.C. § 631 et seq. (1976 & Supp. V 1981), and the Armed Services Procurement Act, 10 U.S.C. § 2301 et seq. (1976 & Supp. V 1981). See Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260, 1263 n. 3 (5 Cir.1978).
 
 
 11
 According to an affidavit by Eugene F. Murphy, BK's executive vice-president and general manager, he was advised by a Mr. Daniels on behalf of the Army on or about March 18, 1983, that in BK's bid the "will not" box concerning subcontractors had been checked. The affidavit avers that Murphy orally advised Daniels that BK intended and agreed to furnish and purchase only end items produced or manufactured by small business concerns. On March 18, Murphy confirmed this in a letter to the Defense Contract Administration in Garden City, N.Y., with a copy sent to Daniels at Fort Monmouth, N.J. The letter concludes, "I trust that this satisfies the immediate question concerning our offer."
 
 
 12
 Murphy's affidavit also alleges that on April 6, 1983, he met with a Government contracting officer, Ms. Maureen E. Cook, advised her that the bid form had been erroneously checked, and further advised that BK "would immediately file a bid protest with the Comptroller General, if her determination of ineligibility were not reversed." Although BK's papers are unclear in this respect as in others, Murphy seems to have left with the contracting officer a new page in which the "will" rather than the "will not" box concerning subcontractors was checked. It is said that despite this the Army, by a letter of April 14, 1983, which is not in the record, ruled that BK was ineligible. Murphy avers that, upon receiving the Army's April 14 letter on April 19, 1983, BK immediately filed a protest with the Comptroller General,[1] and sent a copy to the contracting officer. Despite this, according to Murphy, he learned on April 26, 1983 that the contract had been awarded to American Kal Enterprises, Inc. (Am Kal), whose bid was higher by $14,979. It is undisputed that the award to Am Kal occurred on April 14.
 
 
 13
 On May 2, 1983, BK instituted this action against the United States, the Secretary of Defense, the Commanding General of U.S. Army CECOM (the U.S. defendants) and Am Kal. There is no indication that process has ever been validly served on Am Kal. The complaint asserted that in refusing to allow BK to correct its bid and in awarding the contract to Am Kal, the U.S. defendants had violated section 724 of the Defense Appropriations Act of 1981, Pub.L. No. 96-527, 94 Stat. 3068, 3085-86 (1980), which requires that contracts let under this statute be awarded to the lowest responsible bidders[2] and had acted arbitrarily, capriciously and without substantial basis in violation of DAR 2-407.8(b), 32 C.F.R. § 2:41 (1982). BK sought an order declaring itself to be a responsive bidder, enjoining the Government from relying on its determination of non-responsiveness, declaring BK to have been the lowest responsive, responsible bidder under Solicitation No. DAABO7-83B-B026 and directing the award of any contract thereunder to BK, vacating the award to Am Kal, and, presumably in the alternative, awarding BK its bid preparation costs.
 
 
 14
 BK submitted along with the complaint an order requiring defendants to show cause why injunctive relief should not be granted and restraining the defendants from proceeding under the contract awarded to Am Kal pending the hearing of the motion for an injunction. The district court did not sign the order to show cause but heard counsel for BK and the U.S. defendants on May 2, 1983. No papers seem to have been submitted by the U.S. defendants. Most of the discussion concerned BK's standing and the supposedly exclusive jurisdiction of the Claims Court. The court announced that it would dismiss "on the ground of lack of jurisdiction following what it understands the ruling case law in Edelman", to wit, Edelman v. Federal Housing Administration, 382 F.2d 594 (2 Cir.1967), and also that "[e]ven if there were jurisdiction, the Court would dismiss on the merits since the Government followed its own regulations exactly." An order dismissing the complaint with prejudice was entered on the same day. On May 26, 1983, the Comptroller General dismissed BK's protest without passing on the merits, in accordance with his practice that a judicial dismissal with prejudice constitutes a final adjudication on the merits barring further action by him.
 
 
 15
 BK appealed from the district court's order of dismissal. It moved in this court for a stay of performance of the contract pending appeal or, in the alternative, for an expedited appeal. On May 24, 1983, another panel denied the former motion but granted the latter. Unhappily the multitude and difficulties of the legal questions and our desire to circulate the opinion to all active judges of the court because our rulings on standing and waiver of sovereign immunity depart from positions previously taken* have prevented an earlier decision.
 
 Standing
 
 16
 In holding that BK lacked standing, the district court relied on a passage in this court's opinion in Edelman v. Federal Housing Administration, supra, 382 F.2d at 597, reading as follows:
 
 
 17
 [I]t is well established that an unsuccessful bidder has no standing in a suit to challenge the legality of the bidding procedure. Perkins v. Lukens Steel Co., 310 U.S. 113 [60 S.Ct. 869, 84 L.Ed. 1108] (1940); Fulton Iron Co. v. Larson, 171 F.2d 994 ( [D.C.Cir.] 1948); Heyer Products Co. v. United States, [140 F.Supp. 409 (1956) ]. Bidding procedures are for the benefit of the public generally and confer no private rights on the bidder. It avails appellant nothing to assert that he is not an unsuccessful bidder because Tally's bid was void; this is the issue which he is barred from litigating.
 
 
 18
 Although the quotation was apposite, developments in the law of standing since 1940 have deprived the Lukens case and consequently Edelman of precedential value with respect to a situation like that here at issue.
 
 
 19
 Lukens was not an action by a low bidder to enjoin an award to a higher one but a suit by seven iron and steel producers to enjoin the Secretary of Labor, five other members of the Cabinet and all government procurement officials from applying regulations which defined the term "locality" in the minimum wage provision of the Public Contracts (Walsh-Healey) Act of 1936, § 1(b), 49 Stat. 2036, 2036-37 (current version at 41 U.S.C. § 35), as dividing the country into six localities rather than the much larger number of units which the plaintiffs considered proper. The Court, speaking through Justice Black, was obviously perturbed that as a result of the order of the Court of Appeals for the District of Columbia Circuit, 107 F.2d 627 (1939), granting relief, "The Public Contracts Act, so far as the steel industry is concerned, has been suspended for more than a year, with no bond or security to protect the public's interest in the maintenance of wage standards contemplated by Congress, should the suspension ultimately appear unwarranted or unauthorized." 310 U.S. at 123, 60 S.Ct. at 874. It was in this context that the Court made its oft-quoted observations that, 310 U.S. at 125, 60 S.Ct. at 875 (footnote omitted):
 
 
 20
 It is by now clear that neither damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights in the absence of constitutional legislation recognizing it as such;
 
 
 21
 and that R.S. 3709 (codified as amended at 41 U.S.C. § 5), which required in general terms that all Government purchases and contracts for supplies or services other than personal services shall be made after public advertising "was not enacted for the protection of sellers and confers no enforceable rights upon prospective bidders." 310 U.S. at 126.
 
 
 22
 Enactment of section 10 of the Administrative Procedure Act (APA), ch. 324, 60 Stat. 237, 243, in 1946, now codified and amended as the first sentence of 5 U.S.C. § 702, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," had inevitable implications for Lukens, although these were slow in manifesting themselves. See K.C. Davis, Administrative Law Treatise, 1970 Supplement § 22.20, at 778-82 (1971). What Professor Davis calls "[t]he first basic rejection" of Lukens, id. § 22.20, at 781, was an opinion of Judge Burger, as he then was, for the Court of Appeals for the District of Columbia Circuit in Gonzalez v. Freeman, 334 F.2d 570 (1964), which held that the plaintiffs who had been debarred by the Secretary of Agriculture from participating in certain contracts with the Commodity Credit Corporation had standing to seek judicial review. The Gonzalez opinion acknowledged that it was correct "broadly speaking, to say that no citizen has a 'right', in the sense of a legal right, to do business with the government," 344 F.2d at 574, citing Lukens, but went on to observe that this "cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts." Id.
 
 
 23
 Although the Gonzalez opinion was limited to debarment from participating in government contracts, that deferential limitation of the assault on Lukens did not long endure. In Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970), Judge Tamm, writing for the court, sustained the standing of an unsuccessful bidder to challenge an award on the ground that the Government had decided arbitrarily and capriciously that the successful bid was responsive. The opinion noted that Lukens "was decided during the heyday of the legal right doctrine, and before the passage of the Administrative Procedure Act," id. at 866, and would have to be decided differently on its own facts as a result of the Fulbright Amendment of 1952, Pub.L. No. 429, § 301, 60 Stat. 296, 308 (current version at 41 U.S.C. § 43a), which incorporated certain provisions of the APA in the Walsh-Healey Act, with the sponsor avowing the intention "to overturn that [the Lukens ] decision.' " 424 F.2d at 866 (quoting 98 Cong.Rec. 6531 (1952)).
 
 
 24
 The Scanwell court also referred to the pertinent legislative history of the APA which supported a frustrated bidder's standing to seek judicial review. Both the Senate Committee and the House Committee stated: "This subsection [APA § 10, 5 U.S.C. § 702] confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of any statute." S.Doc. No. 248, 79th Cong., 2d Sess. 212, 276 (1946).
 
 
 25
 The ink had hardly become dry on Scanwell when the Supreme Court decided Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The Court in Data Processing repudiated the "legal right" doctrine as a test of standing; it substituted a two-fold standard, whether the plaintiff "alleges that the challenged action has caused him injury in fact," 397 U.S. at 152, 90 S.Ct. at 829, and "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 829, see Barlow, supra, 397 U.S. at 164-65, 90 S.Ct. at 836. Justices Brennan and White believed it was enough for the plaintiffs to have alleged that the challenged action had caused injury in fact. 397 U.S. at 168, 170-73, 90 S.Ct. at 838, 839-42. Professor Davis has advocated, long and persuasively, that these Justices were correct, see 4 K.C. Davis, Administrative Law Treatise §§ 24:2-24:3, at 211-19 (2d ed. 1983), and that the "zone" qualification, although continuing to be referred to in some opinions, is no longer a vital part of the Supreme Court's jurisprudence with respect to standing. Id. § 24.17, at 273-80.[3] We do not need to decide the question here. In our view section 724 of the Defense Appropriations Act of 1981, which requires that contracts let under that statute be awarded to the lowest responsible bidders, and 10 U.S.C. § 2305(c), which requires the award of advertised government contracts "to the responsible bidder whose bid conforms to the invitation and will be the most advantageous to the United States, price and other factors considered," meet the added requirements of the majority in Data Processing and Barlow, even if these have not been eroded as Professor Davis contends.
 
 
 26
 The governing statutes in this case, section 724 of the Defense Appropriations Act of 1981, and 10 U.S.C. § 2305(c), are far more specific in their reference to bidders than was the provision of the Public Contracts (Walsh-Healey) Act at issue in Lukens. The Report of the House Committee accompanying the predecessor of § 2305(c) explained that the Government should use "sound business judgment" to evaluate a bidder's "experience, facilities, technical organization, reputation, financial resources, and other factors." H.R.Rep. No. 1064, 80th Cong., 2d Sess., reprinted in 1948 U.S.Code Cong. & Ad.News 1048, 1064. When, as is the case here although not in Lukens, the issue is whether the low bidder was capriciously rejected, it is hard to sustain the thesis that the unsuccessful bidder is not even "arguably within the zone of interests to be protected or regulated," especially given the congressional direction to evaluate proposed bids carefully based on individual qualities of soliciting contractors.
 
 
 27
 Doing business with the Government has become an important part of American economic life; arbitrary deprivation of government contracts on non-discretionary grounds is a serious wrong against which Congress may well have wished to protect when it stiffened the bidding statutes. Indeed, Congress amended the Armed Services Procurement Act in 1955 to require that all bids and invitations to bid contain specifications which would give prospective bidders sufficient information to permit them to bid responsibly. Congress enacted this amendment, Act of Aug. 9, 1955, ch. 628, § 15(c), 69 Stat. 547, 551-52 (codified at 10 U.S.C. § 2305(b)), to correct the "deplorable" situation whereby procurement agencies had not given their notices to bid in sufficient detail, thus needlessly injuring prospective bidders. See H.R.Rep. No. 1350, 84th Cong., 1st Sess., reprinted in 1955 U.S.Code Cong. & Ad.News 2713, 2722. As Judge Tamm said in Scanwell, supra, 424 F.2d at 864:
 
 
 28
 When the Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring these procedures can vindicate their very real interests, while at the same time furthering the public interest. These are the people who will really have the incentive to bring suit against illegal government action, and they are precisely the plaintiffs to insure a genuine adversary case or controversy.
 
 
 29
 Other courts have found unsuccessful bidders challenging awards within the "zone of interests" to be protected by applicable procurement statutes and regulations. In Kinnett Dairies, Inc. v. Farrow, supra, 580 F.2d at 1265-66, the court held that a frustrated bidder, as a small business concern challenging the award of a government contract to a large business, asserted interests protected by the Small Business Act, 15 U.S.C. § 631 et seq., and its implementing regulations. The Third Circuit, in Merriam v. Kunzig, 476 F.2d 1233, 1242 (3 Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), stated that the federal procurement statutes protect "not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it." Accordingly, the court held that an unsuccessful bidder was within the zone of interests protected by the applicable procurement statute. Id. (41 U.S.C. § 253(a)). See also Hayes International Corp. v. McLucas, 509 F.2d 247, 256 (5 Cir.) (unsuccessful bidder for Air Force contract challenging award to competitor as being in violation of federal armed services procurement regulations within "zone of interests" protected by such regulations), cert. denied, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); Black Hotel Co. v. Froehlke, 351 F.Supp. 956, 958 (W.D.Okl.1972) (10 U.S.C. § 2305(c) imposes a clear duty on the Government to award contracts to the lowest responsible bidder, which is a duty owed particularly to such bidders; frustrated bidder challenging procurement decision on basis of violation of section 2305(c) has alleged a legal wrong and thus has standing to sue); Aero Corp. v. Department of the Navy, 540 F.Supp. 180, 203 (D.D.C.1982) (unsuccessful bidder has an interest protected by the procurement statute favoring advertised competitive bidding, 10 U.S.C. § 2304(g)).
 
 
 30
 In light of the views expressed in these opinions, it is not surprising that between 1970 and 1975 five circuits adopted the Scanwell principle that a disappointed bidder has standing to challenge the award. Merriam v. Kunzig, supra, 476 F.2d 1223, 1241-43 (3 Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973); William F. Wilke, Inc. v. Department of the Army, 485 F.2d 180, 183 (4 Cir.1973); Hayes International Corp. v. McLucas, supra, 509 F.2d 247, 254-56 (5 Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); Armstrong & Armstrong, Inc. v. United States, 514 F.2d 402, 403 (9 Cir.1975) (per curiam); Airco, Inc. v. Energy Research & Development Administration, 528 F.2d 1294, 1296 (7 Cir.1975) (per curiam); but see People's Gas, Light & Coke Co. v. United States Postal Service, 658 F.2d 1182, 1193 n. 7 (7 Cir.1981) (questioning the validity of Airco given its failure to apply the "zone of interests" standing analysis). The Sixth Circuit, in Cincinnati Electronics Corp. v. Kleppe, 509 F.2d 1080 (6 Cir.1975), while adhering to the "general rule" of Lukens, id. at 1086, held in light of Congress' declaration of policy in 10 U.S.C. § 2301 that "a fair proportion of the purchases and contracts made under this chapter be placed with small business concerns":
 
 
 31
 that an unsuccessful bidder under this Act who alleges that it is a small business concern and that an agency representative has acted illegally in failing to follow regulations designed to implement the congressional policy of awarding a fair proportion of contracts under the Act to small business concerns has standing to seek judicial review of such actions pursuant to 5 U.S.C. § 702.
 
 
 32
 Id. Perhaps most important of all, the Court of Claims has held that despite Lukens, "as a result of Scanwell a party who can make a showing of arbitrary and capricious action on the part of the Government in the handling of a bid situation, does have standing to sue." Keco Industries, Inc. v. United States, 192 Ct.Cl. 773, 428 F.2d 1233, 1237 (1970). On the other hand, the decision of a divided panel of the Seventh Circuit in People's Gas, Light & Coke Co. v. United States Postal Service, supra, 658 F.2d at 1192-1202, while not dealing with the case of a disappointed bidder, indicates that such a bidder would now have tough sledding in establishing standing in that circuit.
 
 
 33
 In this circuit the question whether to adhere to the holding with respect to a disappointed bidder's standing in Edelman in the face of Scanwell first arose in Morgan Associates v. United States Postal Service, 511 F.2d 1223, 1225 & n. 3 (2 Cir.1975). The court did not decide the issue, which was complicated by questions concerning the applicability of the APA to the Postal Service, in view of the need for speedy decision and the fact that a waiver of the regulation claimed to have been violated had completely undercut plaintiff's case. On the other hand, in Spencer, White & Prentis v. United States, 641 F.2d 1061, 1065-66 (2d Cir.1981), we sustained, against an argument based on Lukens, the standing of a low bidder for the completion of a contract for an EPA project that had been terminated because of the original contractor's default to seek to enjoin the county sponsoring the project from rejecting all bids and allowing the original contractor to complete. We did this on the basis that the procedures for protest and judicial review set up by the EPA brought the case within even the restricted application of Scanwell approved by the Sixth Circuit in Cincinnati Electronics, supra. The court thus found it unnecessary to determine broader questions concerning the continued vitality of Lukens in the face of enactment of the APA.
 
 
 34
 We see no basis for further deferring the day when we must make the difficult decision whether to follow Scanwell on facts not fairly distinguishable from it. We call the decision difficult not only because of our reluctance to anticipate the Supreme Court in saying that one of its decisions has been overtaken by subsequent statutes and attendant doctrinal developments, however confident we are as to what the Court's decision will be, but because of policy problems in facilitating litigation by disappointed bidders for Government contracts, with the risks of delay and of double exposure of the Government. Judge Adams expressed these well in his dissent from the denial of reconsideration en banc in Merriam v. Kunzig, supra, 476 F.2d at 1295, and the very circuit that gave birth to Scanwell, noting its abuse, held that in pre-award suits[4] "courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision." M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C.Cir.1971). But these are policy considerations for Congress and we now have impressive evidence of approval of Scanwell in the reports of the Committees on the Judiciary of both houses of Congress on what became the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25.
 
 
 35
 One section of this law, now 28 U.S.C. § 1491(a)(3), provided with respect to the Claims Court which took over the trial jurisdiction of the Court of Claims:
 
 
 36
 To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security.
 
 
 37
 In explaining this, the House report states expressly:
 
 
 38
 It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. See, e.g., Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970).... Therefore, for the time being, the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date.
 
 
 39
 H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981). We quote more fully from the Senate report, S.Rep. No. 275, 97th Cong., 2d Sess. 22-23, reprinted in 1982 U.S.Code Cong. & Ad.News 11, 32-33:
 
 
 40
 In addition, section 133 gives the new Claims Court the power to grant declaratory judgments and give equitable relief in controversies within its jurisdiction. This provision will for the first time give the court specializing in certain claims against the Federal Government the ability to grant litigants complete relief. The committee concluded that this provision will avoid the costly duplication in litigation presently required when a citizen seeks both damages and equitable relief against the Government.
 
 
 41
 Moreover, section 133 gives the new Claims Court the power to grant declaratory judgments and give equitable relief in contract actions prior to award. Since the funds which the Government utilizes to purchase goods and services are derived solely from public sources, the public possesses a strong interest in the ability of the Government to fulfill its requirements in these areas at the lowest possible cost. Accordingly, in the vast majority of circumstances, the Government must be permitted to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner.
 
 
 42
 The courts ordinarily refrain from interference with the procurement process by declining to enjoin the Government from awarding a contract to a contractor which the Government has selected.
 
 
 43
 By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic]. See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970). Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to compete fairly for the procurement award. The Committee intends the court to take care not to delay or prevent the award of contracts for goods or services which relate to the national defense or security.
 
 
 44
 We are well aware that the views of the 97th Congress are not authoritative as to the intent of the Congress that enacted the APA in 1946. See, e.g., United States v. United Mine Workers, 330 U.S. 258, 281-82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947); Haynes v. United States, 390 U.S. 85, 89 n. 4, 88 S.Ct. 722, 726 n. 4, 19 L.Ed.2d 923 (1968); Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 117-18, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980). And we have been recently and authoritatively reminded that even both houses of Congress, much less two committees of Congress, are not the whole of the legislative process. See INS v. Chadha, supra, --- U.S. at ----, 103 S.Ct. at 2782 ("It is beyond doubt that lawmaking was a power to be shared by both Houses and the President."). Still we think it would show some lack of respect to Congress for us to reject Scanwell when its concerned committees have so clearly expressed their desire to have it "left intact". Moreover, the passages we have quoted were something more than mere expressions of opinion; the power of district courts to give declaratory and injunctive relief in cases where unsuccessful bidders sued under "the Scanwell doctrine" was one reason why Congress refrained from authorizing the Claims Court to grant equitable relief except "on any contract claim brought before the contract is awarded," 28 U.S.C. § 1491(a)(3), see United States v. John C. Grimberg Co., 702 F.2d 1362 (Fed.Cir.1983) (en banc). The limitation of § 1491(a)(3) in light of the assumed powers of the district courts as a result of Scanwell thus has a bearing on the propriety of Scanwell's interpretation of § 702 of the APA similar to that which the 1976 removal of the jurisdictional amount in § 1331 suits against Government officials was held to have on the question whether the APA, enacted thirty years earlier, was itself a basis for jurisdiction, see Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), discussed below.
 
 Jurisdiction and Sovereign Immunity
 
 45
 Although adherence to Scanwell removes one roadblock from BK's path, several other possible ones must be considered before we reach the merits.
 
 
 46
 The Scanwell opinion, although briefly rejecting the claim of sovereign immunity, 424 F.2d at 873-74, said nothing about jurisdiction. A later opinion of the District of Columbia Circuit, Pickus v. United States Board of Parole, 507 F.2d 1107, 1109 (1974), listed Scanwell as one of a number of decisions in which that court had "recognized Section 10 of the Administrative Procedure Act ... as an independent source of jurisdiction that empowers district courts to review much agency action regardless of the amount in controversy"--a position which the Pickus opinion made explicit, id. at 1110. The Supreme Court was later to rule otherwise in Califano v. Sanders, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977).
 
 
 47
 The Sanders ruling was explicitly made in the light of the 1976 enactment of an amendment to 28 U.S.C. § 1331(a) which eliminated the requirement of a specified amount in controversy as a prerequisite to the maintenance of any § 1331 action "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity," Pub.L. No. 94-574, 90 Stat. 2721. The Court observed, 430 U.S. at 105, 97 S.Ct. at 984:
 
 
 48
 The obvious effect of this modification, subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate.
 
 
 49
 We have no difficulty in concluding that BK's action arises under both section 724 of the Defense Appropriations Act of 1981 and 10 U.S.C. § 2305(c), already quoted, and that 28 U.S.C. § 1331 thus affords a jurisdictional basis. This holding, however, is by no means the end of the story; it forces us to confront another argument, namely, that the action is one against the United States to which it has not consented and must therefore be dismissed on the ground of sovereign immunity.
 
 
 50
 The suit is indeed against the United States. The complaint names it as a defendant. Even if the complaint had named only the Secretary of Defense and the Commanding General of CECOM, the suit would still have been against the United States. In Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963), the Court stated, citing earlier decisions:
 
 
 51
 The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," Land v. Dollar, 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be "to restrain the Government from acting, or compel it to act." Larson v. Domestic & Foreign Corp., supra, [337 U.S. 682] at 704 [69 S.Ct. 1457 at 1468, 93 L.Ed. 1628]; Ex parte New York, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921).
 
 
 52
 The two exceptions to this rule stated in the Larson opinion, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), to wit, action by an officer beyond his statutorily defined powers or where the powers or the manner of their execution are unconstitutional, id. at 689-91, 69 S.Ct. at 1461-62, are inapplicable here. Even if the contracting officer acted arbitrarily or capriciously in not allowing BK to correct its bid, the action would not lie beyond his power. Id. at 695, 69 S.Ct. at 1464. See as to all of the above, Estate of Pingree v. Blumenthal, 78-1 U.S. Tax Cas. (CCH) p 13,238, at 84,412, 84,413-16 (D.Me.1978) (Gignoux, J.); and Judge Oakes' opinion for this court in Estate of Watson v. Blumenthal, 586 F.2d 925, 929-30 (1978).
 
 
 53
 In considering whether the Government has consented to the suit, we begin with the proposition that, as held in Beale v. Blount, 461 F.2d 1133, 1138 (5 Cir.1972), Pingree, supra, 78-1 U.S.Tax Cas. at 84,414, Watson, supra, 586 F.2d at 930, and Kester v. Campbell, 652 F.2d 13, 15 (9 Cir.1981), cert. denied, 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 298 (1982), 28 U.S.C. § 1331 is not a general waiver of immunity. We have concluded, however, that, for the reasons elaborated below, the Watson opinion was mistaken in advancing, 586 F.2d at 931-32, as an alternative ground for a correct decision, that the 1976 amendment to § 702 of the APA does not constitute such a waiver if, as we later hold in this case but could not have properly held in Watson, the provisions of the last sentence are met.
 
 
 54
 The 1976 amendment, Pub.L. No. 94-574, 90 Stat. 2721, added to what had been 5 U.S.C. § 702:
 
 
 55
 An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.
 
 
 56
 The purpose of the amendment was explained, in reports of the Judiciary Committees of the Senate, S.Rep. No. 996, 94th Cong., 2d Sess. (1976), and the House, H.R.Rep. No. 1656, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 6121, 6121, as being "to remove the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review." The significance of this was heightened by the fact that the same bill contained the provision, referred to earlier in our discussion of jurisdiction, eliminating the requirement of a $10,000 jurisdictional amount in § 1331 suits against the United States, any agency or any officer or employee in his official capacity. More specifically the House Report stated that the amendment to § 702 "would eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency." Id. at 3, reprinted in 1976 U.S.Code Cong. & Ad.News at 6123. The report referred to "the many statutes in which Congress has provided a special procedure for reviewing particular administrative activity," but remarked that "[u]nfortunately, these special statutes do not cover many of the functions performed by the older executive departments, such as the Departments of State, Defense, Treasury, Justice, Interior, and Agriculture." Actions to review such decisions were referred to as "non-statutory review actions and jurisdiction over them lay in the district courts." Id. at 5, reprinted in 1976 U.S.Code Cong. & Ad.News at 6125. However, the defendants in such actions would interpose the defense of sovereign immunity, and much time had to be spent in determining whether the case fell within one of the Larson exceptions. The committees thought "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." Id. at 9, reprinted in 1976 U.S.Code Cong. & Ad.News at 6129.
 
 
 57
 We were thus mistaken in suggesting in Watson, supra, 586 F.2d at 932, that the 1976 amendments to the APA "did not remove the defense of sovereign immunity in actions brought under § 1331." Under Califano v. Sanders, supra, decided after the 1976 amendment, there can be no action "brought under the APA." A highly regarded text comments on the sentence quoted from Watson:
 
 
 58
 Since the Administrative Procedure Act does not itself confer jurisdiction, this would mean, would it not, that the amendments had no effect on immunity at all?
 
 
 59
 and notes that "[t]he Third Circuit forthrightly disagreed" in Jaffee v. United States, 592 F.2d 712, 718-19 (3 Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Hart & Wechsler, The Federal Courts and the Federal System 346 (2d ed. Supp.1981). So have the Fifth, Sixth and Ninth Circuits. Sheehan v. Army & Air Force Exchange Service, 619 F.2d 1132, 1139 (5 Cir.1980), rev'd on other grounds, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); Warin v. Director, Department of Treasury, 672 F.2d 590, 591-92 (6 Cir.1982) (per curiam); Beller v. Middendorf, 632 F.2d 788, 796-97 (9 Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). So now do we.
 
 
 60
 We are still confronted, however, with the question whether the action falls beyond the scope of amended § 702 since "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."
 
 
 61
 The statutes here in question are 28 U.S.C. §§ 1491(a)(1) and (3) and 1346(b). We quote the first in the margin;[5] § 1491(a)(3) has been quoted above, pp. 721-722. With an exception not here material, § 1346(a)(2) grants the district courts jurisdiction concurrent with that of the Claims Court under § 1491(a) if the claim does not exceed $10,000 in amount.
 
 
 62
 The Government relies particularly on 28 U.S.C. § 1491(a)(3). It urges that if suits by disappointed bidders to enjoin the performance of contracts are to be allowed at all, these should be concentrated in a court that has special expertise concerning such claims and can be expected to develop procedures for their expeditious handling, with appeal lying to the Court of Appeals for the Federal Circuit,[6] rather than spread through the district courts across the nation, with appeals from their decisions lying to twelve courts of appeals.
 
 
 63
 While this contention is quite persuasive as a matter of policy, it runs afoul of the language of § 1491(a)(3) as illuminated by its legislative history. The exclusive jurisdiction of the Claims Court to afford equitable relief under § 1491(a)(3) is limited to "any contract claim brought before the contract is awarded." In United States v. John C. Grimberg Co., supra, 702 F.2d 1362, a majority of the Court of Appeals for the Federal Circuit sitting en banc held that "contract claim brought" means "action brought" and that the jurisdiction of the district courts over actions for equitable relief brought under 28 U.S.C. § 1331 after the award remained unimpaired. Although the language of the statute alone might leave room for debate in cases where bid protests were filed prior to award, the legislative history cited by Chief Judge Markey for the Grimberg majority, 702 F.2d at 1369-72, 1374-76, convinces us that Congress did not intend to impair the jurisdiction of the district courts in suits like BK's which were brought after the award. As said in the House report, "the Committee is satisfied by clothing the Claims Court with enlarged equitable powers not to the exclusion of the district courts. The dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date." H.R.Rep. No. 312, supra, at 43. Indeed, the dissents in Grimberg, as we read them, would agree that this suit was not within the exclusive jurisdiction of the Claims Court under § 1491(a)(3) since the protest was filed after the award, see 702 F.2d at 1384 (Kashiwa, J., dissenting), 1389 (Bennett, J., dissenting).
 
 
 64
 This still leaves the question, however, whether the Claims Court would have had jurisdiction over BK's suit under § 1491(a)(1). If it did, the waiver of sovereign immunity in 5 U.S.C. § 702 would arguably be inapplicable since the final clause negates authority "to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" (emphasis supplied). Even though § 1491(a)(1), unlike § 1491(a)(3), does not contain words of exclusivity, the combination of § 1491(a)(1) and the $10,000 limitation in § 1346(a)(2) could well be considered an implied proscription against bringing an action in a district court not within the $10,000 limitation that could have been brought in the Claims Court under § 1491(a)(1).
 
 
 65
 While BK's action is not "upon any express or implied contract with the United States" or, as will be shown below, "for liquidated or unliquidated damages in case not sounding in tort," it is founded upon an Act of Congress, as we have previously held in sustaining jurisdiction under 28 U.S.C. § 1331. However, it is settled that despite the literal breadth of the opening words of § 1491(a)(1), "it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable" in the Court of Claims. Eastport Steamship Corp. v. United States, 372 F.2d 1002, 1007 (Ct.Cl.1967). As Judge Davis there stated:
 
 
 66
 [T]he non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes--those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury. In the first group (where money or property has been paid or taken), the claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute or a regulation. In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum.
 
 
 67
 Id. This limited reading accords with the long established doctrine that the Court of Claims had no jurisdiction to grant equitable remedies under what is now § 1491(a)(1) but was limited to the award of money damages, United States v. Jones, 131 U.S. 1, 18-19, 9 S.Ct. 669, 671, 33 L.Ed. 90 (1889); United States v. King, 395 U.S. 1, 5, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969); Richardson v. Morris, 409 U.S. 464, 465, 93 S.Ct. 629, 630, 34 L.Ed.2d 647 (1973) (per curiam); United States v. Testan, 424 U.S. 392, 397-98, 96 S.Ct. 948, 952, 47 L.Ed.2d 114 (1976) (quoting Eastport, supra ). See United States v. Mitchell, --- U.S. ----, ---- - ----, 103 S.Ct. 2961, 2965-69, 77 L.Ed.2d ---- (1983).[7] A literal reading of the "founded either upon" language of § 1491(a) would mean that all claims of wrongful action by federal officials involving more than $10,000 would have to be brought in the Claims Court--a result clearly in conflict with historic practice and with the plain intent of Congress in the 1976 amendments to § 702 of the APA and 28 U.S.C. § 1331 to make § 1331 the vehicle for actions "seeking relief other than money damages" for unlawful acts of federal agencies, officers or employees in cases where judicial review had not been expressly provided.
 
 
 68
 Still, as pointed out in Watson, supra, 586 F.2d at 931, quoting from 17 Wright, Miller & Cooper, Federal Practice and Procedure § 4101, at 210 (1972):
 
 
 69
 "difficult problems undoubtedly will arise in trying to draw a line between actions that basically are contractual disputes and those seeking to rectify alleged official misbehavior."
 
 
 70
 The courts have established firmly that where the prime objective of the plaintiff is to obtain money from the Government, the jurisdiction of the Court of Claims under § 1491(a)(1) could not be avoided by framing a complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials when the result would be the equivalent of obtaining of money damages. Examples of this are Ove Gustavsson Contracting Co. v. Floete, 278 F.2d 912, 914 (2 Cir.) (suit seeking declaratory and injunctive relief after termination of contract), cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960); Alabama Rural Fire Insurance Co. v. Naylor, 530 F.2d 1221, 1229-30 (5 Cir.1976) (suit stemming from rescission of contract); American Science & Engineering, Inc. v. Califano, 571 F.2d 58, 61-62 (1 Cir.1978) (suit seeking to enjoin termination of license); Bakersfield City School District v. Boyer, 610 F.2d 621, 628 (9 Cir.1979) (suit seeking deferred funds); Alamo Navajo School Board v. Andrus, 664 F.2d 229, 233 (10 Cir.1981) (suit to compel Bureau of Indian Affairs to provide money for operation of school), cert. denied, 456 U.S. 963, 102 S.Ct. 2041, 72 L.Ed.2d 487 (1982); and, the Pingree and Watson cases, supra, (suits to compel Government to accept "flower bonds" in payment of estate taxes).
 
 
 71
 BK's action does not fall within the condemnation of these cases. What BK primarily sought was the cancellation of the award to Am Kal and an award of the contract to it, not damages for loss of profits it would have earned if its bid had been accepted. We have been warned
 
 
 72
 [to] be careful not to subvert the congressional objectives underlying the enactment of the judicial review statute by allowing the government to give an overly expansive scope to the notion of claims "founded upon" contract.
 
 
 73
 Wright, Miller & Cooper, supra, § 4101, at 210-11. Moreover, the Court of Claims has held that it had no power to award damages in a case like this, since no contract with BK had ever come into existence and there was no certainty that it would in light of the Government's power to reject all bids if the head of the agency determines this to be in the public interest, 10 U.S.C. § 2305(c). Heyer Products Co. v. United States, supra, 140 F.Supp. at 412; Keco Industries, Inc. v. United States, supra, 428 F.2d at 1240. Accord, Northland Equities Inc. v. Gateway Center Corp., 441 F.Supp. 259, 264 (E.D.Pa.1977). While the reasoning of these cases may seem strained, they represent settled law.
 
 
 74
 There remains one additional obstacle to BK's action that relates to the issues of sovereign immunity and jurisdiction. A corollary to the principle we have just discussed is that an action seeking specific performance of a contract with the Government may not be brought in a district court to avoid the Tucker Act's limitation of relief to money judgments. As a leading commentary states, such efforts "have uniformly failed." Hart & Wechsler, supra, at 346. See, e.g., Sea-Land Service, Inc. v. Brown, 600 F.2d 429, 432-33 (3 Cir.1979) (district court did not have jurisdiction to order Navy to resume contract with Sea-Land after Navy had cancelled contract and awarded it to another bidder).
 
 
 75
 BK's action for declaratory and injunctive relief is not one requesting specific performance. Since BK has never entered into a contract with the Government, there is no contract which the district court could order the Government to perform. Moreover, we take note, as did the court in Megapulse, Inc. v. Lewis, 672 F.2d 959, 969 (D.C.Cir.1982), that a claim such as BK's is not a "disguised" claim for specific performance of a contract. We recognize that it would be improper to classify all claims raising contract issues as contract actions. Id. at 968-70. Furthermore, we agree with the Megapulse opinion that if an action is not a "contract action" exclusively within the Claims Court's jurisdiction, a district court's choice of remedies is not limited to those available for such actions. Therefore, a district court has jurisdiction to fashion the equitable relief it deems appropriate. See, e.g., Ainslie Corp. v. Middendorf, 381 F.Supp. 305 (D.Mass.1974); Collins & Co. v. Claytor, 476 F.Supp. 407 (N.D.Ga.1979); Peter Kiewit Sons' Co. v. United States Army Corps of Engineers, 534 F.Supp. 1139 (D.D.C.1982).
 
 
 76
 We thus conclude that the district court had jurisdiction of the action and that the United States had waived sovereign immunity.
 
 The Merits of BK's Complaint
 
 77
 As indicated, BK's position is that the checking of the "will not" box in the representation whether subcontractors would be small business concerns was an obvious clerical error which it should have been allowed to correct, since the check would have made its bid a futility.
 
 
 78
 The futility assertion appears to be well-founded; indeed, the Government has not challenged it. The cover sheet of the Solicitation for the bids, announced that it was "a 100% set-aside for Small Businesses," and the body of the Solicitation repeated this. These provisions incorporated by reference Defense Acquisition Regulation (DAR) 7-2003.2, 32 C.F.R. § 7:469 (1982), which provides:
 
 
 79
 (a) Restriction. Offers under this procurement are solicited from small business concerns only and this procurement is to be awarded only to one or more small business concerns....
 
 
 80
 (b) Definition. A "small business concern " is a concern, including its affiliates, which is independently owned and operated, is not dominant in the field of operation in which it is offering on Government contracts, and can further qualify under the criteria set forth in regulations of the Small Business Administration.... In addition to meeting these criteria, a manufacturer or a regular dealer submitting offers in his own name must agree to furnish in the performance of the contract end items manufactured or produced by small business concerns: Provided, That this additional requirement does not apply in connection with construction or service contracts.
 
 
 81
 While the term "end items" is not defined, BK and the Government seem to agree, as indeed the context indicates, that it refers not simply to the solicited item, here tool kits, but also to the components.
 
 
 82
 BK moves on from this position to a contention that the checking of the "will not" box was an "apparent clerical mistake" within DAR 2-406.2, 32 C.F.R. § 2:31 (1982), which we set forth in the margin.[8] In the light of the examples given, it clearly was not.
 
 
 83
 However, the procurement regulations do not stop with "Apparent Clerical Mistakes." DAR 2-406.3(a), 32 C.F.R. § 2:31 (1982), provides:
 
 
 84
 Other Mistakes.
 
 
 85
 (a) The Departments are authorized to make the following administrative determinations in connection with mistakes in bids, other than apparent clerical mistakes, alleged after opening of bids and prior to award.
 
 
 86
 (1) When the bidder requests permission to withdraw a bid and clear and convincing evidence establishes the existence of a mistake, a determination permitting the bidder to withdraw his bid may be made.
 
 
 87
 (2) However, if evidence is clear and convincing both as to existence of the mistake and as to the bid actually intended, and if the bid, both as uncorrected and as corrected, is the lowest received, a determination may be made to correct the bid and not permit its withdrawal.
 
 
 88
 (3) When the bidder requests permission to correct a mistake in his bid and clear and convincing evidence establishes both the existence of a mistake and the bid actually intended, a determination permitting the bidder to correct the mistake may be made; provided that, in the event such correction would result in displacing one or more lower bids, the determination shall not be made unless the existence of the mistake and the bid actually intended are ascertainable substantially from the invitation and the bid itself. If the evidence is clear and convincing only as to the mistake, but not as to the intended bid, a determination permitting the bidder to withdraw his bid may be made.
 
 
 89
 (4) When the evidence is not clear and convincing that the bid as submitted was not the bid intended, a determination may be made requiring that the bid be considered for award in the form submitted.
 
 
 90
 If this regulation were applicable, the issue would seem to be whether BK's evidence of mistake was so clear and convincing that, despite the use of the word "may" in DAR 2-406.3(a)(3), the contracting officer acted arbitrarily and capriciously in not allowing this, and the complaint and the affidavits in support of the motion for a temporary injunction were sufficient that this issue should not have been decided against BK without affording it an opportunity to present evidence. It is true, of course, that if, upon the hearing of a motion for a temporary injunction, "insuperable objection to maintaining the bill clearly appears, it may be dismissed and the litigation terminated." Meccano, Ltd. v. John Wanamaker, New York, 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822 (1920). See also Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940); CES Publishing Corp. v. St. Regis Publications, Inc., 531 F.2d 11, 15 (2 Cir.1975). But this principle cannot properly be applied when the plaintiff has not been afforded a fair opportunity to establish its case. Here there was only an informal argument on whether an order to show cause would issue. While the district court had enough before it to enable it to make its ruling on standing, it thus should not have ruled on the merits of BK's claim, thereby undercutting BK's protest to the Comptroller General, see supra p. 6, unless BK's complaint was insufficient as a matter of law.
 
 
 91
 The Government says it was since correction is not permitted when the bid is unresponsive. For light on this subject we look for guidance to decisions of the Comptroller General, an official with wide expertise and experience concerning government procurement awards to which federal courts should accord deference when deciding procurement cases.
 
 
 92
 It is undeniable that by erroneously certifying that it would not purchase supplies from small business concerns, BK rendered its bid non-responsive. See, e.g., Jimmy's Appliance, 82-1 CPD p 542, at 3 (1982). The general rule is that the mistake-in-bid procedures under DAR 2-406, 32 C.F.R. §§ 2:31-2:32 (1982) are not applicable to correct a non-responsive bid in order to make it responsive. See, e.g., Bayshore Systems Corp., 76-2 CPD p 395, at 2 (1976). The reasons for such a general rule are plain. The Government wishes to be certain that the bidder is bound to furnish what it asked, and a practice permitting the submission of a non-responsive bid and correction to make the bid responsive after the flaw has been detected would deter other bidders. This general rule, however, is not inflexible, and the Government has permitted bidders in " 'very limited' " circumstances to correct non-responsive bids. See, e.g., Slater Electric Co., 75-2 CPD p 126, at 3 (1975) (quoting 52 Comp.Gen. 604, 607 (1973)). In that decision, the Comptroller General noted that certain errors rendering a bid non-responsive may be corrected " 'if the bid, as submitted, indicates not only the probability of error but also the exact nature of the error.' " Id. (quoting 52 Comp.Gen. 604, 607 (1973)). Thus, the ultimate inquiry presumably will focus on whether BK may avail itself of this exception and if so, whether the Government's rejection of its bid was arbitrary and capricious. Here the Army had early detected BK's error and BK had promptly remedied it well before the award to Am Kal. While its case may not have been so persuasive as that of the disappointed bidder in Jimmy's Appliance, supra, where the bid of a small business concern mischaracterized the bidder itself, it comes sufficiently near it that further inquiry into the facts by the district court was required.
 
 
 93
 In saying this we do not mean that proof of arbitrary and capricious action by the Army would automatically entitle BK to injunctive relief. Post-Scanwell courts have considered several factors in exercising their discretion to award equitable relief to frustrated bidders. See generally Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838 (D.C.Cir.1982); Note, Judicial Review and Remedies for the Unsuccessful Bidder on Federal Government Contracts, 47 N.Y.U.L.Rev. 496, 513-17 (1972); Comment, Government Contract Bid Protests: Judicial Review and the Role of the Court of Claims, 39 U.Chi.L.Rev. 814, 826-30 (1972). They have looked carefully at the interests to be affected by equitable relief, fully aware that the Government and the public may be harmed when courts interfere with agencies' procurement decisions. Although finding some merit in frustrated bidders' claims, courts have leaned toward favoring the Government's interests at the expense of bidders' interests. See, e.g., A.G. Schoonmaker Co. v. Resor, 445 F.2d 726 (D.C.Cir.1971); M. Steinthal & Co. v. Seamans, 455 F.2d 1289 (D.C.Cir.1971); American District Telegraph v. Department of Energy, 555 F.Supp. 1244 (D.D.C.1983). Courts have also considered partial performance of a contract to be an important factor in the denial of equitable relief to frustrated bidders. See, e.g., Keco Industries, Inc. v. Laird, 318 F.Supp. 1361, 1364 (D.D.C.1970) (given partial performance of the contract, "only very serious governmental irregularities will support injunctive relief"). Here it seems likely that the contract will be well on its way to performance before the district court can pass on BK's claims. Small as BK's chances to obtain injunctive relief thus may now be, it deserves the opportunity to present its case of which it was improperly deprived in May, 1983, unless the Government is correct in asserting that Am Kal is an indispensable party under Fed.R.Civ.P. 19.
 
 Am Kal as an Indispensable Party
 
 94
 The district court did not deal with the question whether the action must be dismissed because of the impossibility of serving process upon Am Kal. The legal consequences of this fact, if it be one, are governed by Fed.R.Civ.P. 19(a) and (b), which we quote in the margin.[9]
 
 
 95
 It seems clear that Am Kal meets the criteria of Rule 19(a)(2). Am Kal's interest is the subject of BK's action, and if the district court should order the U.S. defendants to cease performance under the contract with Am Kal, Am Kal's interest could be effectively extinguished. The Government would very likely avail itself of its right under DAR 7-103.21(b), 32 C.F.R. § 7:22 (1982), to "terminate for the convenience of the Government." Under this provision, the amount awardable to Am Kal would only include its costs incurred under the contract, with a possibility that the Government would pay Am Kal's expected profits on the completed portion of the contract.
 
 
 96
 Am Kal's "interest" in BK's action encompasses more than its anticipated profits from the contract. Small businesses such as Am Kal benefit from the experience gained by working with the Government under a procurement contract. Contracting experience is an important factor in a firm's ability to garner future procurement awards. See 3A Moore's Federal Practice p 19.07-1[2.-1], at 19-132 (2d ed. 1983) ("Interest" under Rule 19 should not be defined narrowly; "[i]t is enough that as a practical matter [an absent party's] rights will be affected.") (footnote omitted).
 
 
 97
 In a similar situation, the court in A. & M. Gregos, Inc. v. Robertory, 384 F.Supp. 187 (E.D.Pa.1974), ordered the allegedly aggrieved bidder to join the successful bidders as defendants to its action seeking injunctive relief to require the government to approve its bid and thus take away the award to the absent third parties. The court followed the directives of Rule 19 by noting that if the frustrated bidder "prevails on its claim that the government acted without rational basis in refusing to award it the contracts, these successful bidders may be denied the right to complete performance of the contracts." Id. at 194.
 
 
 98
 Our consideration of this subject is impeded by our lack of knowledge whether the process of the district court can be effectively served on Am Kal.[10] We know only that Am Kal is located in Industrial City, California. We do not know whether it is doing business in New York within the meaning of N.Y. CPLR § 302(a)1 (McKinney Supp. 1982-83), or whether BK might be able to effect service under Fed.R.Civ.P. 4(d)(3) and (f), although we gather that these possibilities are deemed to be slim. If Am Kal cannot be subjected to its process, the court must give consideration to the factors mentioned in Rule 19(b) and other relevant ones. If the court should rule in BK's favor on the merits but should decide that dismissal of the claims for declaratory and injunctive relief is required either because of Rule 19(b) or of the equitable factors mentioned in the preceding section of this opinion, it should allow recovery of BK's bid costs, assuming that these do not exceed $10,000. See Crawford v. Cushman, 531 F.2d 1114, 1126 n. 17 (2 Cir.1976); Keco Industries, Inc. v. United States, supra.
 
 
 99
 The judgment dismissing the complaint with prejudice is reversed and the cause is remanded for further proceedings consistent with this opinion. No costs.
 
 
 
 [1]
 BK sent its protest to the Bid Protest Unit of the General Accounting Office in Washington, D.C. BK submitted that its error in checking the wrong box should not render its low bid non-responsive and ineligible for award. BK requested that the Government declare it to be the lowest responsive, responsible bidder, and that any contracts awarded under the Solicitation be awarded to it
 
 
 [2]
 BK could also have relied on the federal procurement statute, 10 U.S.C. § 2305(c) (1976), which provides that contracts subject to formal advertisements for bids under 10 U.S.C. § 2304(a), shall be awarded "to the responsible bidder whose bid conforms to the invitation and will be the most advantageous to the United States."
 
 
 *
 No judge has objected to the filing of this opinion
 
 
 [3]
 In its recent opinion in INS v. Chadha, --- U.S. ----, ----, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983), the Court, speaking through the Chief Justice, said simply in sustaining Chadha's standing:
 We must also reject the contention that Chadha lacks standing because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests. Chadha has demonstrated "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury...." (citation omitted).
 The Court cited Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978), which also did not mention the "zone" requirement. See the discussion in 4 K.C. Davis, supra, § 24:32, at 326-29.
 
 
 [4]
 In light of 28 U.S.C. § 1491(a)(3) discussed below, it would seem that such suits can no longer be brought except in the Claims Court
 
 
 [5]
 28 U.S.C. § 1491(a)(1) provides:
 The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.
 
 
 [6]
 Both the Claims Court and the Court of Appeals for the Federal Circuit are authorized to sit outside of Washington. 28 U.S.C. § 462(d)
 
 
 [7]
 On the other hand, the Court of Claims was not barred from using equitable doctrines as an incident of its power to award money damages. See, e.g., Pauley Petroleum Inc. v. United States, 219 Ct.Cl. 24, 591 F.2d 1308, 1316-17, cert. denied, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979)
 
 
 [8]
 2-406.2 Apparent Clerical Mistakes. Any clerical mistake apparent on the face of a bid may be corrected by the contracting officer prior to award, if the contracting officer has first obtained from the bidder written or telegraphic verification of the bid actually intended. Examples of such apparent mistakes are: obvious error in placing decimal point; obvious discount errors (for example--1 percent 10 days, 2 percent 20 days, 5 percent 30 days); obvious reversal of the price f.o.b. destination and the price f.o.b. factory; obvious error in designation of unit. Correction of the bid will be effected by attaching the verification to the original bid and a copy of the verification to the duplicate bid. Correction will not be made on the face of the bid; however, it shall be reflected in the award document
 
 
 [9]
 Rule 19. Joinder of Persons Needed for Just Adjudication
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 [10]
 The record shows that, after dismissal by the district court, BK mailed a copy of the complaint to Am Kal at its headquarters in Industrial City, California. This would be ineffective under Fed.R.Civ.P. 4 unless Am Kal was doing business in New York within the meaning of N.Y. CPLR § 302(a)1 (McKinney Supp. 1982-83)