**CONNECTICUT LEGAL SERVICES, INC.**

v.

**Stephen B. HEINTZ, Commissioner, State of Connecticut Department of Income Maintenance**

**and**

**Center for Medicare Advocacy, Inc.**

**Civ. No. H–87–751 (PCD).**

United States District Court, D. Connecticut.

June 16, 1988.

---

William H. Clendenen, Jr., and David Lesser, Clendenen & Lesser, P.C., New Haven, Conn., for plaintiff.

Brad S. Plebani, Charles C. Hulin, South Windham, Conn., for applicant Center for Medicare Advocacy, Inc.

Arnold I. Menchel, Asst. Atty. Gen., Hartford, Conn., Joseph F. Skelley, Jr., Deborah S. Freeman, Joel J. Rottner, Skelley, Vinkels, Williams & Rottner, Hartford, Conn., for defendants.

## RULING ON PENDING MOTIONS

DORSEY, District Judge.

### I. *Facts and Procedural History*

Connecticut Legal Services ("CLS") and intervenor, Center for Medicare Advocacy ("CMA"), are non-profit corporations providing legal services to low income persons. Stephen B. Heintz is the Commissioner of the Connecticut Department of Income Maintenance ("DIM") and is sued in his official capacity. DIM is responsible for the administration of Connecticut's Medicaid program.

Medicaid is a joint state-federal medical assistance program authorized under Title XIX of the Social Security Act ("Act"), 42 U.S.C. § 1396 *et seq.*, to provide medical assistance to the indigent. A state choosing to participate in the Medicaid program

must comply with applicable federal law and regulations. 42 U.S.C. § 1396a. One such requirement is that the local administrative agency must "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan" § 1396a(a)(25); 42 C.F.R. § 433.138(a). "One of the areas in which [DIM] found substantial liability on the part of a third party payer has been the area of Medicare denials of payment to Medicaid beneficiaries when payment was actually appropriate under Federal law." Defendant's Memorandum in Support of Motion to Dismiss at 2. From February 1, 1982 through September 30, 1987, DIM contracted with CLS to provide legal services to those who were denied medicare.

In 1986, CMA emerged as a competitor providing such legal services. In March 1987, DIM issued a Request for Proposal ("RFP") with regard to three legal services contracts to be funded with Title XIX Medicaid funds: (1) a contract to provide legal services to Title XIX recipients denied medicare coverage for care received in skilled nursing facilities and chronic disease hospitals ("representation contract"); (2) a contract to study the feasibility of providing legal representation for those denied medicare coverage for home health care services; and, (3) a contract to study the feasibility of providing legal representation for those denied medicare coverage for acute care hospitals (two and three collectively referred to as "feasibility studies"). In response, only CLS and CMA submitted bids. CMA was awarded the three contracts.

CLS now claims that defendant failed to comply with federal law and regulations in awarding the contracts to CMA. It claims that the loss of the DIM contract will cause it irreparable harm and will negatively affect its provision of legal services to the indigent throughout the state. It requested a declaration that defendant's procedures violated § 1396 *et seq.*, and 42 U.S.C. § 1983, a preliminary and permanent enjoinder of defendant from awarding the DIM contracts to CMA, and a preliminary and permanent enjoinder of defendant from refusing to award the representation con-

tract to CLS. Plaintiff subsequently modified its request, however, to seek only that the court order defendant to reconsider the award in accordance with all applicable rules and regulations. During the reconsideration, plaintiff agreed that CMA could provide the requisite legal services. Ruling on Motion for More Definite Statement (January 8, 1988); Plaintiff's Addendum to Motion for Preliminary Injunction.

This ruling addresses the following motions:

(1) Plaintiff's Motion to Reconsider the Ruling on CMA's Motion for Joinder
(2) CMA's Motion to Dismiss
(3) Defendant's Motion to Dismiss
(4) Plaintiff's Motion for Preliminary Injunction

## II. *Discussion*

### A. Motion for Reconsideration

■ On November 30, 1987, CMA's motions to intervene and defendant's motion for joinder were granted inasmuch as it was determined that CMA's interest would be directly affected if plaintiff's request for relief was granted. Plaintiff argues that CMA is unnecessary to the case and will unduly complicate the litigation. The argument is disingenuous. CLS and CMA were the only two bidders for the three DIM contracts. Plaintiff seeks to preclude the award of those contracts to CMA. CMA has a very real interest in the relief CLS seeks. CMA's intervention will not complicate the case. For all intents and purposes, CMA and defendant have presented similar arguments. The requirements of Fed.R.Civ.P. 19(a) (joinder) and 24(a)(2) (intervention) have been met. Accordingly, upon reconsideration, the court adheres to its prior rulings.

### B. Motions to Dismiss

Defendant argues that plaintiff's complaint is subject to a number of attacks. First, he claims that plaintiff's claims are barred by the eleventh amendment, as plaintiff may not recover past monetary damages and may obtain redress only for

claims of unconstitutional conduct by defendant. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Defendant argues that 28 U.S.C. §§ 1343 and 1331 provide no jurisdiction basis to present such claims. Defendant also contends that 42 U.S.C. § 1983 provides no relief as plaintiff has no constitutionally protected due process interest. Thus, as plaintiff has not alleged an independent jurisdictional basis for the suit and cannot show a constitutional deprivation, the court is without jurisdiction. Defendant further contends that, even if a proper jurisdictional basis is stated, a claim for relief is not stated as defendant was not bound to apply the procedures contained in Office of Management and Budget Circular, 45 C.F.R. Part 74, App. G. ("Circular" or "OMB Circular") and, even if he was, the failure to do so does not confer on plaintiff a private cause of action. CMA's motion to dismiss echoes defendant's arguments.

Plaintiff disavows any standing based upon a deprivation of a property or liberty interest, but bases his claim instead on defendant's failure to follow the mandate of Title XIX and the procedures in the Circular. It argues that a disappointed bidder has the right to challenge defendant's conduct, the award of the contract to CMA, and to obtain reconsideration of the bidding in full compliance with the regulations.

### 1. *Relevant Legal Principles and Outline of Approach*

It is well settled that for purposes of a motion to dismiss the well pleaded material allegations of the complaint are taken as true. 2A *Moore's Federal Practice* ¶ 12.07 [2.–5] (2d Ed.1985). However, it is for the court to decide if the allegations of fact in the complaint rise as a matter of law to the level of a cognizable claim for relief. Thus, any conclusory allegation in a complaint that a plaintiff has been denied some right in violation of federal law is subject to review by the court on a motion to dismiss. *Id.* If mere conclusory allegations of the denial of rights under the Constitution and laws of the United States were taken as true, the elaborate rules and procedures for bringing a motion to dismiss would be pointless.

*Al–Charles, Inc. v. Heintz,* 620 F.Supp. 327, 330 (D.Conn.1985).

These motions to dismiss present complicated issues of federal jurisdiction, standing, and statutory construction. Neither the relevant statutes nor the case law provide clear guidance. The following general issues must be addressed:

(1) Can the actions of a Title XIX state agency, which solicits bids and awards a contract for legal services to assist in the administration of its Medicaid program, allegedly in violation of applicable federal law and regulations, be reviewed in federal court?

(2) If so, does plaintiff have standing to seek that review? and,

(3) If so, is plaintiff's cause of action nevertheless barred by the eleventh amendment?

### (a) Ability of Federal Court to Entertain Suit

Plaintiff alleges that 42 U.S.C. § 1396 *et seq.,* and its implementing regulations, particularly 45 C.F.R. § 74.160, *et seq.,* and the OMB Circular provide it with the private right to challenge defendant's conduct under 42 U.S.C. § 1983.[1]

---

**1.** Contrary to defendant and CMA's assumption, plaintiff has not challenged defendant's conduct as an unconstitutional deprivation of a property or liberty interest. In *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 963 (2d Cir.1988), the court considered the "circumstances under which a governmental contract may be said to create a property interest protected by procedural due process." After noting that the Supreme Court had enlarged the scope of the interests protected by the fourteenth amendment over the last twenty years, the court reiterated the current test: " 'To have a property interest in

a benefit, a person clearly must have more than an abstract need or desire for it. He must instead, have a legitimate claim of entitlement to it.' " *Id.* at 965–66, quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiff, a company which had contracted to maintain New York City's parking meters, was there held not to have a constitutionally protected property interest by virtue of its contract and the city's breach of that contract could not be challenged as a

"*Maine v. Thiboutot*, 448 U.S. 1, 7–8 [100 S.Ct. 2502, 2505–06, 65 L.Ed.2d 555] (1980), held that § 1983 was available to enforce violations of federal statutes by agents of the State." *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). The Court, however, has recognized two exceptions to the application of § 1983 to statutory violations, both of which require determination of congressional intent. *See Mrs. W. v. Tirozzi*, 832 F.2d 748, 754 (2d Cir.1987). "First, no action under § 1983 shall lie if Congress intended to foreclose private enforcement except by the remedial mechanism provided in the statute itself. *Smith v. Robinson*, 468 U.S. 992, 1012 [104 S.Ct. 3457, 3468, 82 L.Ed.2d 746] (1984); *Middlesex County Sewage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 [101 S.Ct. 2615, 2626, 69 L.Ed.2d 435] (1981)." *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F.Supp. 316 (D.Conn.1988), Ruling on Defendants' Motion to Dismiss 3. Thus, in *Smith*, the Court held that §. 1983 should not be used to circumvent the administrative remedies provided for in the Education of the Handicapped Act which itself allowed suit by a private party. Likewise, in *Sea Clammers*, "an intent to foreclose resort to § 1983 was found in the comprehensive remedial scheme provided by Congress, a scheme that itself provided for private actions and left no room for additional private remedies under § 1983." *Wright*, 107 S.Ct. at 771.

"Second, a plaintiff may not bring a § 1983 action if Congress intended the substantive statute in question merely to state a preference or policy declaration rather than to create enforceable rights in the private party. *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 15 [101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (1981)." *Concerned Tenants*, 685 F.Supp. at 318. "In *Pennhurst*, a § 1983 action did not lie because the statutory provisions were thought to be only statements of 'findings' indicating no more than a congressional preference—at most a 'nudge in the preferred directio[n],' ... and not intended to rise to the level of an enforceable right." *Wright*, 107 S.Ct. at 770–771 (citation omitted).

Whether plaintiff has the right to question defendant's conduct as in violation of federal law requires a consideration of the history, intent, and language of the relevant portions of the Medicaid Act and the regulations.

"The Social Security Act in general, and the Medicaid title of that Act in particular, is one of the most complex statutes Congress has ever enacted." *Commonwealth of Massachusetts v. Secretary*, 816 F.2d 796, 801 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988), citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). In construing the statute, "the Social Security Act should be broadly construed, so as to carry out Congress' intent to provide medical expense coverage for all qualifying individuals." *Mayburg v. Secretary*, 740 F.2d 100, 103

---

violation of the company's fourteenth amendment rights.

Similarly, the majority of jurisdictions have held that a disappointed bidder on a state or municipal contract has no right to sue in federal court on the ground of a deprivation of a property or liberty interest in violation of the fourteenth amendment. *See Curtis Ambulance of Florida, Inc. v. Board of County Commissioners*, 811 F.2d 1371, 1376–78 (10th Cir.1987); *see also Sowell's Meats & Serv., Inc. v. McSwain*, 788 F.2d 226 (4th Cir.1986); *Coyne–Delany Co. v. Capital Dev. Bd.*, 616 F.2d 341 (7th Cir.1980); *Kasom v. Sterling Heights*, 600 F.Supp. 1555 (E.D.Mich.1985), *aff'd without opinion*, 785 F.2d 308 (6th Cir.1986). Those cases which have reached the opposite result, *see L & H Sanita-* *tion, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517 (8th Cir.1985); *Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6 (W.D.Pa.1981); and *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980), have been characterized as a minority and have been limited to their facts. *Curtis Ambulance*, 811 F.2d at 1377. Plaintiff has not alleged nor could it have proved that it was deprived of a property interest under the fourteenth amendment. Indeed, even had it attempted to do so under Connecticut law, it would have run afoul of *Ardmare Const. Co. v. Freedman*, 191 Conn. 497, 502, 467 A.2d 674 (1983), which specifically holds that a disappointed bidder has no right to the contract and thus no property interest upon which he could seek relief.

(1st Cir.1984). The purpose of the Act is defined in § 1396 of Title XIX:

> For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical assistance, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independent or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter.

"The appropriation for achieving these purposes is automatic, as is the Secretary's corresponding payment to the states for costs incurred in pursuit of these goals and in compliance with the statute." *Commonwealth of Massachusetts*, 816 F.2d at 801. As the intent of the statute is the provision of medical assistance, defining that term is "central to the reimbursement decision." *Id.*

Under § 1396a(a)(25), the state must " 'ascertain the legal liabilities of third parties ... to pay for care and services available under the [Medicaid] plan ...' and refuse to provide that care or service, or, where the agency has already provided care, 'seek reimbursement for such assistance to the extent of legal liability.' " *Id.* at 803, quoting § 1396a(a)(25). Pursuant to that section, states may enlist organizations such as CMA and CLS to assist in identifying and securing payment from third party payers. Neither the statute nor the regulations directly define the nature or scope of this relationship.

The OMB Circular[2] is contained in Part 74 of Title 45 of the regulations which are authorized in 41 U.S.C. § 401 *et seq.* Sec-

tion 74.1 of the regulations defines the purpose of the Part as the establishment of "uniform requirements for the administration of HHS grants and principles for determining costs applicable to activities assisted by HHS grants." To that end, the Circular "establishes standards and guidelines for the procurement of of supplies, equipment, construction and services for Federal assistance programs. These standards are furnished to ensure that such materials and services are obtained efficiently and economically and in compliance with the provisions of applicable federal law and Executive Orders." 45 C.F.R. Part 74, App. G. at § 1.a.; *see also* 41 U.S.C. § 402.

The OMB Circular is discussed in two separate places in the regulations. 45 C.F.R. § 74.161 provides that "[f]or procurements by governmental recipients,[3] awarding parties and recipients shall comply with ... [the] Circular." The requirement "applies to recipient procurements of supplies, equipment, and services (including construction)."[4] 45 C.F.R. § 74.160(a). The OMB Circular is also discussed at 42 C.F.R. § 434.1, *et seq.* The regulation "sets forth the requirements for contracts with certain organizations for furnishing Medicaid services or processing or paying Medicaid claims, or enhancing the agency's capability for effective administration of the program." *Id.* at § 434.1(b). It further provides that all contracts under this part "must ... [i]nclude provisions that define a sound and complete procurement contract, as required by [the OMB Circular]." *Id.* at § 434.6(a)(1).

A contractor is defined as

> any of the following entities that contract with the Medicaid agency under a state plan and in return for a payment, to process claims, to pay for or provide medical services, or to enhance the agen-

---

2. Defendant acknowledges that he represented in the RFP that the Circular would apply. He argues, however, that this mistaken representation does not mean that the Circular in fact applies nor that plaintiff has standing as a disappointed bidder to challenge his compliance with the Circular.

3. A governmental recipient is a state or local government entity "to which a grant is awarded and which is accountable to the federal government for the use of the funds provided." 45 C.F.R. § 74.3.

4. The word "services" is not defined in the regulations.

cy's capability for effective administration of the program:

....

(c) A private nonmedical institution[5]

....

(h) A professional management service or consultant firm.

*Id.* at § 434.2

The term " *'[p]rofessional management service or consultant firm'* means a firm that performs management services such as auditing or staff training, or carries out studies or provides consultation aimed at improving State Medicaid operations, for example, with respect to reimbursement formulas or accounting systems." *Id.*

Plaintiff argues that as a "professional management service or consulting firm" it bid on a contract to provide legal "services" to the state and that the state was obliged to comply with the procurement standards of the OMB Circular in comparing the bids it received and in awarding the contract. Defendant argues that the regulations were not meant to cover bidders like CLS and CMA nor contracts like the ones involved herein. He points to 45 C.F.R. § 95.605 which, in the context of "automatic data processing services," couples the term service with the terms "equipment" and "supplies," *viz,* tangible articles which can be easily quantified. He also argues that in adding the term "professional management service or consulting firm" to 45 C.F.R. § 434.2, the Secretary intended to reach entities which provided traditional health care services, i.e., health maintenance organizations. He adds that this conclusion is supported by the conspicuous absence of any discussion of this term when the Secretary notified the public of the change in the regulations. Defendant's Memorandum of Law in Support of Motion to Dismiss at 43, citing 47 Fed.Reg. 43087–43088 (September 30, 1982).

Defendant's argument is unnecessarily restrictive and inconsistent with both the purpose of the Medicaid Act and the OMB

Circular. Although defined solely in the context of "Automatic Data Processing Services," the term "services" includes the performance of feasibility studies and system studies. *See* 45 C.F.R. § 95.605. Thus, by extrapolation, the term "services" as it is used in other portions of the regulations must be similarly defined. As such, the term clearly covers the feasibility contracts in issue. Furthermore, defendant's interpretation notwithstanding, CLS would classify as a professional management service or consulting firm. As a bidder on a state contract under Title XIX, it would therefore be entitled to the protections of the OMB Circular. Indeed, both § 434.1(b) and the OMB Circular define the Act's purpose as to assist the state in effectively administering the Medicaid program in the most economical manner—a purpose quite consistent with 42 U.S.C. § 1396a(a)(25); *cf.* 41 U.S.C. § 402.

Nothing in the language, congressional history, or purpose of either the Medicaid Act or the regulations suggests that Congress intended to foreclose a private party from challenging a state's compliance with the OMB Circular nor that Congress intended merely to suggest to the states the proper approach to bidding contracts without providing a right of redress to those who were disappointed by a state's failure to so adhere. In reaching this conclusion, the court is aware that the Fourth Circuit Court of Appeals reached a different result in considering the applicability of the OMB Circular and whether it afforded a private right of action to a disappointed bidder in the context of the national school lunch program. *See Sowell's Meats,* 788 F.2d at 228–29. In considering the Circular, the *Sowell* court noted the language at 45 C.F.R. App. G. at § 10b(b)(2):

Awards shall be made only to responsible contractors that possess the potential ability to perform successfully under the terms and conditions of a proposed procurement. Consideration shall be given

---

**5.** A private nonmedical institution is an institution which "provides medical care to its residents through contracts or other arrangements with medical providers." 42 C.F.R. § 434.2.

Thus, although seemingly applicable to organizations like CLS or CMA, the latter cannot be classified as private nonmedical institutions.

to such matters as contractor integrity, compliance with public policy, record of past performance, and financial and technical resources.

Construing this section as giving the state agency broad discretion to decide to whom it would make its awards, the court read the provision to suggest the absence of a private cause of action on the part of disappointed bidders. *Sowell's Meats*, 788 F.2d at 229. The court also noted that the state agency would have incentive to comply with the Act because of the watchdog role of the supervising federal agency. *Id.*

Although there is concededly little distinction to be drawn between the national lunch program considered in *Sowell* and the Title XIX program considered herein, the Fourth Circuit's analysis is not found to be persuasive. As noted, the regulations make the OMB Circular applicable to contracts such as the ones in question here. Furthermore, disappointed bidders, such as CLS, who suffer possible harm because their proposals are not subjected to the appropriate review as defined in the procurement standards, meet the two-fold requirement of standing: (1) injury in fact and (2) the interest sought to be protected is within the zone of interest to be protected by the constitutional guarantee, statute or regulation. *Association of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 164–65, 90 S.Ct. 832, 836–37, 25 L.Ed.2d 192 (1970); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 718–19 (2d Cir.1983). When a bidder's proposal is "capriciously rejected, it is hard to sustain the thesis that the unsuccessful bidder is not even 'arguably within the zone of interests to be protected or regulated,' especially given the congressional direction to evaluate proposed bids carefully based on individual qualities of soliciting contractors." *B.K. Instrument*, 715 F.2d at 719, quoting *Association of Data Processing Serv. Organizations*, 397 U.S. at 153, 90 S.Ct. at 830.

Moreover, contrary to the Fourth Circuit's analysis, nothing in the Act or the regulations appears to restrict this right.

The language noted by the Fourth Circuit does indeed vest the state agency with discretion in the awarding of its contracts; but, that discretion is relevant to the burden a disappointed bidder must overcome if it seeks to prevail on its claim that the state agency acted wrongfully. By implication, however, the discretion can only be acted upon in relation to the proposals submitted by the various bidders. It stands to reason, therefore, that if the state does not act properly, the bidders, in addition to the program beneficiaries are the ones who suffer.

The Fourth Circuit's analysis is furthermore not in keeping with relevant Second Circuit authority. *Sowell's Meats* relied primarily on *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), a decision which indisputably held that disappointed bidders on federal contracts did not have standing to question the award of a contract as inconsistent with the procurement standards unless the act in question clearly vested standing. Noting recent developments in the law and particularly the passage of the Administrative Procedures Act, the Second Circuit held in 1983 that *Perkins* was of questionable merit and refused to follow its previous holding in *Edelman v. Federal Housing Admin.*, 382 F.2d 594 (2d Cir.1967), denying standing to a disappointed bidder. *B.K. Instrument*, 715 F.2d at 717–19. It noted: "Doing business with the Government has become an important part of American economic life; arbitrary deprivation of government contracts on non-discretionary grounds is a serious wrong against which Congress may well have wished to protect when it stiffened the bidding statutes." *B.K. Instrument*, 715 F.2d at 719. It held that, although the bidding procedures are designed for the benefit of the public generally, it is the bidders who have the real economic incentive to bring arbitrary governmental action to light. *Id.* at 720, citing *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir.1970).

[W]hen the government solicits business, it cannot act in an arbitrary fashion—either substantively or procedurally—to

**90**

wards those it solicits. ... Laws have been enacted to protect individuals against arbitrary and capricious government conduct and to ensure that federal agencies conduct their business fairly and responsibly.

*Chemung County v. Dole,* 781 F.2d 963, 969 (2d Cir.1986) (citations omitted).

*Sowell's Meats* also relied on *Phelps v. Housing Auth. of Woodruff,* 742 F.2d 816, 822–23 (4th Cir.1984), which held that disappointed potential tenants in a housing project regulated by both state and federal laws had no private cause of action under federal law. The Second Circuit had reached the opposite conclusion. *Beckham v. New York City Housing Auth.,* 755 F.2d 1074 (1985). In *Wright,* the Supreme Court followed *Beckham* and held that the tenants there had a private right of action under 42 U.S.C. § 1983 to challenge the state's alleged violations of the applicable federal law.

■ Thus, while *B.K. Instrument* and *Chemung County* are not dispositive of this motion as they involved federal agencies and dealt with different sources of law, their lesson is the recognition of Congress' willingness to accord standing to disappointed bidders. The applicable regulations in this case and the OMB Circular make the federal procurement process applicable to bidders like CLS. It is they who are harmed if the procurement process is not followed and thus they who have standing to sue to vindicate their rights under the Act and regulations. Furthermore, while it is true that HHS does act in a watchdog capacity over the contract, its actions do not preclude disappointed bidders from suing. Indeed, if the policy of the OMB procurement process and the applicable Medicaid provisions is to make the system more efficient and economic, it hardly seems consistent with that policy to vest the federal agency with sole supervisory authority. To do so is to constrict the supervision which can ensure the proce-

dures by which the purpose of the Act is achieved.

Plaintiff may pursue its action under 42 U.S.C. § 1983.[6] The court has jurisdiction over the suit by virtue of 28 U.S.C. §§ 1331 and 1343. That jurisdiction is limited, however, by virtue of the Eleventh Amendment to plaintiff's claims of prospective injunctive relief. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102–03, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984), citing *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Its claims for damages and other retroactive relief are barred. *Id.* 465 U.S. at 103, 104 S.Ct. at 909.

**C. Motion for Preliminary Injunction**

"The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits." *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *State of New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 754 (2d Cir.1977). "In order to obtain a preliminary injunction in this Circuit, the moving party must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir.1987); *Consumers Union of United States v. General Signal Corp.,* 724 F.2d 1044, 1048 (2d Cir. 1983), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

Plaintiff argues it is entitled to a preliminary injunction because (1) it has suffered and will suffer irreparable harm by virtue of the allegedly improper awarding of the contract to CMA and will likely succeed at trial on the merits or (2) has presented sufficient evidence to suggest that there are serious questions as to the propriety of defendant's conduct and the respective eq-

---

**6.** Defendant and CMA's remaining arguments have been considered and not found to be persuasive.

uities in this case tip in its favor. With respect to the alleged impropriety of defendant's conduct, plaintiff makes four principal arguments:

(1) It did not award the contract to CLS as the lowest bidder.

(2) It did not solicit bids on a "sealed bid" basis as required by the regulation.

(3) It improperly used the competitive negotiation method for the feasibility studies.

(4) It failed to comply with the OMB mandatory procedures.

## 1. *Irreparable Harm*

Plaintiff argues that as a non-profit organization it relies heavily on public grants and contracts to sustain its operation on a daily basis. It notes that if it loses the DIM contract it may be forced to reorganize its operation and layoff experienced, yet relatively inexpensive, staff persons. These changes will in turn negatively affect its ability to provide legal services to the indigent who are dependent upon organizations like CLS to represent their interests. It further notes that the loss of the DIM contract may have a domino affect inasmuch as the absence of its ability to provide service will deter other organizations from hiring CLS staff members to instruct such organizations as to how they might develop similar systems. *See* Testimony of Norman K. Janes, Transcript at 104–06 (October 30, 1987). Plaintiff argues that defendant will not suffer any harm from having to reassess the bids which he allegedly improperly assessed initially nor will CMA be harmed as it will be allowed to continue its representation of its current clients during the thirty day remand and, in the event CLS is awarded the contract, can continue the representation of those clients for which it has already begun providing legal services.

There is no real doubt but that CLS was and will be adversely effected by the award to CMA. The consequent loss of income to plaintiff will have a significant impact on its operation. It is not clear, however, that that harm amounts to an irreparable loss. Although plaintiff would lose roughly $170,000 in income due to the loss of the state contract, that loss would not be immediate as it would still be compensated for services rendered pursuant to the previous contract. Transcript at 118–19 (October 30, 1987). Staff members who were hired and the office supplies which were purchased in anticipation of the award of the DIM contact will not be a total loss. Staff can be relocated and the office supplies used in plaintiff's other services. Nevertheless, for purposes of this motion, it will be assumed that plaintiff has demonstrated irreparable harm in the fact that an interruption of the flow of income will jeopardize the momentum it has achieved in rendering legal services, a loss which cannot be readily reestablished, even by receipt of compensatory damages.

## 2. *Likelihood of Success or Sufficiently Serious Questions and Tipping of the Equities*

Plaintiff argues that defendant was required to apply the sealed bid method of procurement to the representation contract. The Circular provides that the sealed bid method is appropriate where (1) the subject of the contract can be adequately and completely described; (2) there are two or more responsible bidders; and (3) selection of the successful bidder can be appropriately made principally on the basis of price. 45 C.F.R. Part 74, App. G. at 11.6.(1)(a)–(c). Plaintiff argues that inasmuch as defendant advertised its request for bids and requested bidders to offer "one fixed price per case," Request For Proposal at 19, it implicitly acknowledged that the sealed bid method was the appropriate procurement process. As such, and given that its bid was allegedly lower than CMA's, it argues that it should have been awarded the contract.[7] *Id.* at 11.b. (in sealed bid method, contract is awarded to lowest bidder).

Plaintiff's argument fails because it assumes that the sealed bid standard was the only proper means by which the contract could have been bid. The contracts at is-

---

7. Although the issue is not reached herein, both CMA and defendant have challenged plaintiff's allegation that its bid was lower in cost than CMA's bid.

sue herein could not be assessed strictly on a cost basis. Obviously, DIM's interest is to secure the best results for the cheapest price. The results, however, depend entirely on the legal talent of and resources available to the contracting party. Thus, while the bottom line is indeed important in the assessment of the contract, it is not the entire criterion upon which the award of the contract must be based. In the terms of the regulation, the procurement did not lend itself to a firm, fixed-price contract.[8] *Id.* at 11.b.(1)(c). Furthermore, the fact that defendant advertised for bids, required them to be sealed, and asked for a price per case estimate does not mean that it either utilized or was required to utilize the sealed bid method. The Circular allows the state to use its own procurement procedures provided they comply with the federal regulations. *See Id.* at 2.b. That flexibility remains and is not lost to defendant even though, perhaps out of an abundance of caution and to be unquestionably fair, defendant publicly advertised its request for bids and sealed those bids it actually received.

Defendant argues, and its actions were consistent therewith, that it assessed the bids under the competitive negotiation process. Testimony of Holly Miller–Sullivan, Department of Income Maintenance contract administrator, Transcript at 147–48, 172–73 (October 30, 1987). That process is used when a sealed process is not appropriate. 45 C.F.R. Part 74, App. G. at 11.c. As noted, the sealed bid process in this case was not appropriate because the contracts could not be awarded strictly on the basis of cost.

The competitive negotiation process allows for publication of the request for proposals and requires the assessment of a number of factors, including cost. *Id.* at 11.c.(1) and (2). Thus, defendant's publication of its request for proposals and its consideration of the bottom line cost factor as one of the evaluation factors is clearly not inconsistent with the competitive negotiation system. Indeed, the regulations themselves suggest that the competitive negotiation system is the proper approach where the state is evaluating bids for professional services "whereby competitors' qualifications are evaluated." *Id.* at 11.-c.(5).

Plaintiff nevertheless argues that defendant did not comply with each requirement of the competitive negotiation system. It argues that defendant did not identify in its RFP the significant evaluation factors it would consider nor did it identify their relative importance. The RFP clearly outlines the areas that DIM would evaluate in assessing the bids. Those factors are fully explained at pages 15 through 20 of the proposal. While the relative importance of each of those factors was not specified, that failure did not harm plaintiff. The bids were evaluated, *see* Plaintiff's Exhibit 10, by a panel of four whose qualifications and integrity are not challenged. Although plaintiff challenges the panel's evaluation criteria as inconsistent with the RFP, such inconsistency is not substantiated in the record.[9]

Plaintiff also challenges defendant's action as being inconsistent with the Circular at 10.b.(b)(2) requiring that "awards be made only to contractors that possess the potential ability to perform successfully under the terms and conditions of a proposed procurement." However, defendant considered such items as the qualifications and work experience of the respective staff, the bidder's organization, and the soundness of its proposal. DIM claims that it chose not to give added weight to this factor because it found both organizations to be qualified and competent to do the work and did not want to favor the incumbent. Assessment of the respective bidders' past performance as a separate factor would not have resulted in a calculation which clearly favored either. CMA basically was constituted of

---

8. Inasmuch as subsection 11.b.(1)(c) of the regulation was not met, the court need not consider whether subsection 11.b.(1)(a) and (b) were met.

9. Both CMA and CLS had the opportunity to contact DIM with questions concerning the RFP. *See* Plaintiff's Exhibit 9 at 12. Both entities contacted DIM with questions regarding the substance of the proposal. *See* Defendant's Exhibit A. Neither party questioned the propriety of the proposal insofar as its compliance with the Circular was concerned.

the architects of the CLS program. CLS, as an organization, may have had the better track record; but, by reason of the decision of its staff, its experience at the time of the bidding was questionable, especially in comparison to the greater, individual experience of the CMA staff members.

Plaintiff's remaining challenges to defendant's compliance with the OMB Circular are equally unpersuasive. It has not demonstrated that it is likely to succeed at trial on the merits, nor that a serious question exists as to the merits of its claim with a balance of the equities tipping in its favor. Plaintiff's harm, to the extent it is assumed herein, has occurred because it was not awarded DIM's contract. It has not claimed, nor has it a basis for doing so, that defendant was obligated to renew the contract it previously worked under, nor to award it the new contract. Even if the preliminary injunction prayed were granted, defendant would merely be required to reconsider the bids and the award made anew, with no guarantee that plaintiff would then be awarded the contract. CLS and CMA cannot both win the contract; one or the other must eventually suffer the rejection of its bid—a necessary and foreseeable consequence to all but one of the bidders who rely on public contracts as a revenue source. Transcript at 213–14 (October 30, 1987). Furthermore, the court must as well consider the interests of the state and the intended beneficiaries of the program, whose interests it represents. *See City of Hartford v. Hills*, 408 F.Supp. 879, 882 (D.Conn.1975), citing *Virginia Ry. Co. v. System Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). While the relief sought by plaintiff is narrow, thus minimizing the adverse affect on the beneficiaries, it is nevertheless true that the state will have to bear the cost of reassessing the contracts. Furthermore, it cannot be said that there will be no duplication of expense and confusion during defendant's reassessment and the assumption of the contract duties after the final award.

Based on all facts now apparent, CLS has shown neither a likelihood of success on the merits nor sufficiently serious questions concerning the merits with the balance of equities tipping in its favor to warrant the relief requested. Defendant does not appear to have failed to comply with the OMB Circular's principle and, with several noncrucial exceptions, its procedures.

III. *Conclusion*

Accordingly:

(1) Plaintiff's Motion to Reconsider is granted and upon reconsideration the court adheres to its previous rulings;

(2) Defendant's Motion to Dismiss is denied;

(3) CMA's Motion to Dismiss is denied;

(4) Plaintiff's Motion for Preliminary Injunction is denied.

Counsel shall report on the status of this matter and their future intention regarding same on or before June 30, 1988.

SO ORDERED.